In the next case is Westrock v. Pace. Mr. Field is here for the appellate. Ms. Keller is here for the appellees. Mr. Field, you may begin when you're ready. Ms. Keller is ready. Ms. Keller, I understand from the clerk that your flight was canceled and that you missed your flight today. Thank you very much for your devotion and your dedication. We're glad to see you here. Thank you. Mr. Field? May it please the Court, Eric Field on behalf of Westrock. Your Honors, the District Court erred in this case because there are two clear, explicit causes of action under ERISA for employment. This is a crucial issue for employers and really for multi-employer plans in general because if plans really can adopt this rule on top of withdrawal liability, on top of higher contribution rates required under rehab plans, employers simply will not be able to stay in these plans any longer. But you're not challenging the adoption of the rule, right? That's what the cause of action, that's what you're seeking to do. You had a chance to... We're seeking to have the rule, correct, we're seeking to have the rule declared unenforceable because it's not a valid update to a rehabilitation plan and it's also not a valid rule under subtitle E of ERISA. They try to characterize it as though it's not a withdrawal rule because they put it under their rehab plan and say it's a Section 305 rule, but it's only applied against withdrawn employers. If you stay in the plan, it's not a charge against you, so it has to be a withdrawal rule because it doesn't apply to everybody. Funding rules are rules that require contributing employers to pay certain amounts and a rehab plan is supposed to give a schedule of contribution rate increases and a schedule of possible benefit cuts and also look into ways to cut expenses. But the key is that the contribution rate and the benefit cuts are still supposed to be presented to the bargaining parties to negotiate over. That's not what they did here. They just imposed a liability upon a withdrawing employer. That is a employer withdrawal rule. Subtitle E deals with all special multi-employer pension plan rules. Well, it's a decision by the fund, a discretionary decision by the fund to enforce a rehabilitation plan which is adopted to alleviate the fund from critical status, dire financial condition. But it's a rule that Congress didn't give them the right to adopt. When Congress adopted the Pension Protection Act of 2006, it told critical status plans and endangered status plans both. You had to come up with a set of rules to get your plan out of endangered or critical status. Here's what you do. You can increase the contribution rates. You can cut to some extent, but you can cut future benefit accruals. To a very small extent, you can cut actual accrued benefits. You present different schedules to the bargaining parties. They negotiate over which schedule we want and if we contribute more, we have smaller benefit cuts. That's what a rehabilitation plan was supposed to do. Congress recognized that at some point, you can't charge employers higher contribution rates on top of withdrawal liability if they ever withdraw and still make them responsible for paying even more contributions if there's a funding deficiency. Congress recognized that because in Section 302B3, it says if you're an employer contributing to a critical status plan that has a rehab plan, you don't have to contribute sufficient amounts to avoid a funding deficiency. So they knew that employers can't be at the front of paying everything. It's tough to figure out what Congress intended and what Congress knew and we don't have a whole lot of case law on this and so we're making an effort here to interpret this statute. But I guess my question is to what extent should we take into consideration the purpose of the amendment to ERISA through this Pension Protection Act, which is to bring these funds back, to give these funds the authority to bring the funds back in the sound financial condition. So if Congress intended to create this cause of action to challenge these discretionary decisions, it seems like it's contrary to the purpose of the Act itself because if you've got this cause of action, then employers can, you know, they can put the fund in litigation, costly litigation. They can delay the rehabilitation plan. It costs a lot of money. It's expensive. There's delay, which is contrary to the purpose of the plan itself. I would argue that allowing this type of rule is contrary to the purpose of the PPA and I'll explain why. First off, the employers in West Rock and the employers in Pineapple are paying their contribution rate increases. They got their rehab schedule. The plan told them this is the contribution rate you have to pay. Here's one of your schedules. Go negotiate with the union. They did that. So they are paying the contributions they were required to pay to improve the plan. The reason why I say if you allow this rule to go forward, that it's actually going to have the opposite effect, is that if multi-employer pension plans know that these rules are valid, you're not going to have any contributing employers. And Pineapple is the perfect example of why. I'm going to interrupt you. Most of what you've been talking about is challenging the substance of that new, I call it the new paragraph. You know what I'm talking about. The new paragraph in the plan. But the problem in this case, I think, that Judge Wilson was trying to get at is you don't have a cause of action to challenge this. Now, I realize that puts you in a bad spot and we'll talk about that later, but you say 502A10. If you are right in your 502A10, that means you, the employer, have as expansive a cause of action as do participants and beneficiaries under 502A1 and participants, beneficiaries and fiduciaries under 502A3. And the language of 502A10 is clearly narrow and we're supposed to interpret it as narrow under our Gulf case and all kinds of cases. So I just don't see how you have a cause of action to begin with. And on top of that, apparently the history of these plans is that employers have had traditionally, before this PPA, no cause of action at all except the very ministerial one about getting some disclosures. What do you think about all this? I disagree on a few points. Because I think we are asking for the narrow cause of action. We're asking, what we're saying is what they have isn't a rehab plan because it has, because it violates the law. If what, if your interpretation is true, what you do is build into a rehab plan. These are the entirety of the ERISA law. So that if it violates the ERISA law, especially with your talk about 302E3, is that what it is, or B3, that has nothing to do with this rehab plan. That's in an entirely different section. It's just that would be a different violation of ERISA. And if, under this update of the rehab plan, they have to have a different make sure that the updated rehab plan qualifies under every aspect of ERISA, that's exactly what participants and beneficiaries get under 502A1 and A3. But participants and beneficiaries wouldn't know what their rehab plan says because they don't see it. It has to be the employers who have the cause of action. And if I'm wrong, that means plans could adopt anything, put the title rehab plan on it, have no provisions whatsoever, sign it. That's not going to do anything for the plan, but then no employer could challenge it. Well, And B3. If West Rock withdraws and then the plan seeks files and action to make West Rock pay for its pro rata share of the accumulated deficiency, then West Rock can assert as an affirmative defense that the amendment to the plan violates ERISA, couldn't it? But withdrawal is not a unilateral decision. They have a union. They have to bargain out. And why should they be forced to withdraw? Because the plan adopted an illegal rule. And I'd also point out, even if there isn't a cause of action under 502A10, which I still proffer that there is because we just want them to adopt what is really a rehab plan, is clearly a cause of action under 430A1. Before we get there, is the government correct that traditionally there has not been any cause of action at all for an employer up until this very limited one in 502A10? There always has been one under 4301A1. Okay. They are correct under 502. But I think that supports me because I think Congress knew that rehab plans are important because employers pay the penalties if there aren't rehab plans. So we should give the employers the right to make sure they're adopting a rehab plan in accordance with the law. Okay. Go ahead to 430 whatever that number is. 4301A1. Even if I'm wrong about 502A10, 4301A1 says employers, among other parties, have a cause of action against a plan, plan sponsor, fiduciary trustee, or for any act or omission under Subtitle E that adversarially affects employers. And Subtitle E has to do with that withdrawal liability. Well, Subtitle E has to do with more than just withdrawal liability. It has to do with multi-employer plan rules and specifically with employer withdrawals. Part 1 of Subtitle E deals with employer withdrawals. And it meticulously details what an employer can charge, excuse me, what a plan can charge a withdrawn employer when they withdraw. Well, how does that help you if it meticulously details and leaves out what you're talking about? Are we supposed to read it in when they're that meticulous about what they're talking about? If they, I would argue, if they wanted plans to be able to charge more than withdrawal liability against a withdrawn employer, they would have said so. But there is nothing in that Part 1 that says there's withdrawal liability that they define very precisely. There's nothing that says that that's the only charge that can be imposed on a withdrawing employer. Is that not true? Well, yes, but if the law doesn't say you can charge it and there's no contract that says you can charge it, what possible basis can a plan charge it? Can a plan just pick out random employers across the country and say, we're a reasonable measures plan, we need some money, please give it to us? 305E rehab plans. Under 305E, the employer has to negotiate the contribution rate with the union. It's not, they don't get to arbitrarily tell you what you pick. You have to negotiate what you're going to pay with the union. The only thing that they can charge that you don't negotiate is the surcharge. Under PPA, if you don't negotiate with the union the rates that the law requires, the plan can charge you a 5% surcharge for the first year and a 10% surcharge the years thereafter. They can't just arbitrarily. I need to talk to you about this bargaining business. Several problems with respect to that. Number one, you did not argue that in your blue brief, your initial brief at all. I don't think you argued it in the district court. You in the district court and the blue brief, you talking about the problem of . . . you think this new paragraph was barred by 302B3. You never did say it was barred by 305 itself for failure to submit it to the bargaining. That's the first problem. Second problem is it is true that on the initial adoption of a rehab plan, you have to submit it to the parties and it is subject to agreement and bargaining. But the rehab provision is different and does not say anything about submitting it. I understand you are submitting it to bargaining. I understand your argument that the very definition of contribution rate is defined in those sections that call for bargaining. But that is quite a stretch. And secondly, it doesn't make a lot of sense that Congress . . . in other words, when Congress talked about the update in E3B, it doesn't talk about submitting it to bargaining at all and the update has to be done annually. That doesn't make much sense. Congress' original adoption, submit to bargaining, but every year, submit to bargaining doesn't make much sense. Well, actually, let me clarify. Actually, even the rehab plan itself isn't submitted to bargaining. It's the contribution rate schedules under the Rehab Administrative Bargaining. So when you . . . I agree, if you just updated your rehab plan and you weren't going to make employers pay more, there'd be no reason to send it to the parties because there's nothing to negotiate over. But if you have a schedule now that says you've got to increase your contribution rates by three percent every year, employers negotiate that, that's done with. But if you realize that our rehab plan isn't working, we now need employers to increase their contribution rate by four percent. The only way that can happen is if you get it into the employer's collective bargaining agreement. If you're correct. If you're not correct, that's not the only way you can . . . Well, how else would the employer know what they're supposed to pay? They don't actually . . . if they don't get the schedule, they wouldn't know. And . . . I think that you submit it to bargaining. I'm now looking at E3A, which talks about submitting it to bargaining, little 1I. Little 2I is where we are, where the sponsor of the plan itself, the trustee, has decided that there are no measures that can get this plan out of critical status within the 10-year time limit. And therefore, my reading of this little 2I is that that plan sponsor can impose, quote, reasonable measures to forestall possible insolvency. What's wrong with that? What's . . . here's what's wrong with that. What you're saying is, all right, there is no schedule that we can give employers and unions that would get this plan out of critical status. What you're saying is, we know that the contribution rate that we'd have to make employers pay and the benefit cuts that we'd have to have the union agree to are so egregious that we're not going to make you do that. We'll make you do something less. We'll make you do what is reasonable. That's not what they're doing. They're doing the exact opposite. They're saying, because we can't charge you more on a contribution rate to get us out of critical status, we're going to charge you more. It doesn't make any sense. You can't pay it, so we're going to charge you more. And the funding deficiency is clearly more. Right now, it's about $50 million. Or that was the beginning of 2015. I haven't seen the new numbers, but I'd guess it's significantly more. Their own actuary projects that it will be a billion dollars eight years from now. To me, that's paying a whole lot more than you'd pay under a rehab rate schedule. So it doesn't make sense that a regular plan can only charge what the employers can pay, but if that's not enough, then a reasonable measures plan can make you pay more. Because if that was true, everybody could get out of critical status. The plan could just go to the employers, you're going to pay whatever we say you have to pay to get us 80% funded. Reasonable measures means the exact opposite. I have one other question. You know, you keep saying, first thing, if in your 4301 argument about cause of action, if you come under one of the withdrawal calculation provisions itself, which I forget those numbers, it's something like 1381 to 99, then you have to go to arbitration. That's not necessarily true, Your Honor, because we're not challenging a determination under those sections. We're not challenging a calculation. We're challenging a rule that applies to all employers. And I know it's district court, and it's not in this circuit, but just two weeks ago, three weeks ago, a district court in Nevada held just the opposite. If you have a rule, albeit in that case, it wasn't disputed, it was clearly a specific withdrawal liability calculation rule. But if you have a rule that applies to everybody broadly, and the employer who's challenging the rule isn't challenging the calculation, he's just challenging the rule, he doesn't have to go to arbitration. And the court relied on the... First name, did you submit it? Did you submit that case, this 28J? Yes, we did. Okay. It's J.B. Viva Vegas v. Nevada du Jour, IATSE, Local 720. So just assume for a minute you're wrong on that, that if it falls under that 1381 to 99, you have to go to arbitration. Second, you'd never point to a section either within that 1381 to 99, or in subtitly, but outside of those sections that have to go to arbitration. What section do you think it comes under? I think it comes under subtitle E broadly. What I'm saying is Congress dictated the universe of charges that you could impose on a withdrawing employer. But you acknowledge, I haven't looked at it myself, but my law clerk looked at every one of the sections under subtitle E, and this claim doesn't fit under any. No, because Congress never thought of an employer charging a withdrawing employer the funding deficiency, because it's charging withdrawal liability. In fact, this is the only plan in the country that's done this. Okay. Well, are you asking us to find that implicitly Congress would have done this? No. No, I'm asking to say that there's a direct cause of action under 4308A1 for an employer to challenge an act or omission. The act is creating a rule that's going to tack on additional liability upon a withdrawn employer. They can't do that, and 4301A1 entitles us to both legal and equitable relief. That's what we're asking, Your Honor. All right. I think we have your argument. We will now hear from Ms. Keller. Good morning. May it please the Court, Kathleen Keller for the Pension Fund. The Court has correctly zeroed in on the issue here, whether ERISA gives an employer who want participating in a critical status multi-employer pension fund a cause of action to challenge the substance, the specific provision, a specific substantive provision in a duly adopted rehabilitation plan. And I think opposing counsel's concession at the podium is significant. He conceded that they are not challenging the adoption, they're challenging the enforcement. But this is not at all what 502A10 gives them a right to challenge. This Court has stressed repeatedly, and particularly in the Gulf Life case, civil actions in ERISA are limited only to those parties and actions that Congress has specifically enumerated. It's been often noted that ERISA is a comprehensive and reticulated statute. Congress went to a great deal of trouble to very specifically define who could bring what sort of suits and at what time. Here we're looking at a relatively new subsection within 502, 502A10, and that is a very narrow and carefully drawn cause of action for employers to seek an order compelling a plan to adopt the funding improvement plan or rehabilitation plan or to update or comply with the terms of a rehabilitation plan or funding improvement plan in accordance with the section requirements of section 305. And if we look at specifically the language within 502A10, it is really very particular language. We can compare it to a couple other provisions within 502 that have much more general and broad language. 502A3, which gives a very broad right of action to participants and beneficiaries to sue to challenge any violation of the subchapter. But also 502A8, which is almost immediately preceding A10 and was adopted at the same time, Congress gave employers, again, a little bit of a broader right of action there, a So if Congress had wanted to give employers a right of action to challenge any violation of subchapter 1, it had that language. It could have looked at the language of A3 and borrowed that language. If Congress had wanted to give employers a cause of action to challenge anything that it thought violated 305, it again had easy language to do that. It could have borrowed the language from 502A8 and used very simple language to do that. But instead it used a much more complicated linguistic structure. There's a lot more words in A10 than there are in A8. And the reason it did that was that it was tracking very specific requirements. It's using the words update, comply, adopt, and those are all specific subheadings within 305. Let me ask you a question about subsection. Is it double I that Judge Anderson questioned your brother about? And if the plan sponsor determines in its discretionary decision that there have to be, quote, reasonable measures to emerge from critical status, at a later time, the forced all possible insolvency. How does the plan ensure that all reasonable measures as required under the forced all section are exhausted? If you don't have a cause of action, how do you make that determination? This is a determination for the plan sponsor, the trustees, to make. And these are not easy decisions to make, clearly. Anytime you have a situation where the finances of an entity are not good, very difficult decisions need to be made. And there is no question but that when you're coming up with a rehabilitation plan, particularly for a plan that cannot see a clear way to emerge from insolvency within a reasonable period of time, that extremely difficult decisions have to be made. And that is for the trustees to make. And Congress was very careful in setting out a process. So Let me ask you this. I asked that question to your opponent. I don't know the answer. It looks like you could read that little one eye and little two eye like Judge Wilson and I are referring to, that you have to submit to the parties for bargaining under little one eye. But if you're in such a bad situation that you can't reasonably get out of critical status, then the trustees can, without submitting even the initial adoption to a bargaining of the parties. Is that the correct reading? Your Honor, I I say I'm not at all sure that's the correct reading. Your Honor, I think in this case that question, with due respect, is a bit of a red herring. And I'll explain why, which is that Westrock in its pleadings did not plead that the problem here is that it was not presented to the bargaining parties. I understand that. They didn't argue that in the district court or in our court until the reply brief. But let's get to the matter. We might go that way. But you know, there's not very much law here. So we might decide to address it. So what's your best guess on that? Well, I think the statute is clear that the contribution schedule increases need to be considered that in bargaining as to whether they want to adopt that. And if they don't adopt that, then the statute has some implications that flow from that decision. But the statute is not clear about whether the more general and broader reasonable measures would all need to be submitted in that way. And so I think the necessary implication is that the plan has more flexibility there. I do say, as I said, You acknowledge the law is unclear on that. It is unclear. But it's certainly it isn't mandated in the way that the presentation of contribution schedule increases is mandated to be presented to the bargaining parties. But the fact of the matter is, is these rehabilitation plans are not a secret. They are sent out to all the bargaining parties. And when they're updated, they're sent out again. So this is not the issue about whether or not it was presented to the bargaining parties. As I said, it's not in the pleadings, but it's also really a non-issue because these documents are not held in a vault somewhere. They are circulated and everybody knows they should read them. They should know what they say. Let me interrupt you with a question. How do you respond to the argument that far from helping the situation, which of course this was meant to do, it's going to provide an incentive for employers to all start withdrawing now rather than to wait? Because it's clear that if they wait, you're going to get into almost astronomical figures. Isn't that a little self-defeating? And I mean, how would you respond to that? These are decisions for the trustees to make and not for the lawyers or with all due respect for the court to make at this point. The trustees have very difficult decisions facing them. And it is a board of trustees which half of the trustees are appointed by employers, half of the trustees are appointed by the unions, and they need to come together to grapple with these very difficult issues and try to find their best way out for the plan. And that was what was done here. The statute does provide certain mechanisms. There's a provision that if the trustees are unable to reach agreement, there's very strict deadlines, so they have to come up with these plans on a very strict timetable because Congress realized that they were going to be tough choices and didn't want them to drag out indefinitely. There's a provision within the law that for an expedited dispute resolution process, if the trustees are unable to come to an agreement, so Congress was clearly thinking about the fact that these are not going to be easy decisions and it's foreseeable that the trustees may have some difficulty agreeing. And that's, I think, getting back to 502A10, that's precisely what Congress was doing with 502A10, is giving participating employers an opportunity to force the trustees to act if the trustees are refusing to act. So it's conceivable that you could have trustees that are just impossibly deadlocked or you could have trustees that would prefer to stick their head in the sand and think, well, the market will come up, we're just going to wait it out. And Congress said, no, no, no, we want to give employers the right to say you have to adopt this plan according to the timeline set forth in 305 and you have to update this plan according to your more recent actuarial experience. So for instance, if the market were to come up, which it actually has recently, but if the market were to increase such that the plan's funding starts to look much better than it had at the time the rehabilitation plan was adopted, under the provisions in 305 regarding the required updates, the plan has to update the plan to reflect the improving experience of the plan. And you can imagine possibly a plan that said, you know what, we kind of like these higher contribution rates, even though our plan experience is looking really good right now, we're going to keep the old higher rates in effect. So Congress gave employers the right to say, no, no, no plan, you're required to update annually based on your experience, you haven't done that, so please go do it. But what Congress did not do was give employers the right to second guess these incredibly difficult decisions that the plan trustees have to make. And that makes perfect sense when you think about the structure of these plans that we've pointed out in our brief and this court has pointed out that there's a certain safety check due to the fact that the plans are required to be jointly trustee both by union appointed trustees and employer appointed trustees. But you think about these plans have dozens, hundreds of participating employers. And understandably, in a group that large, there are going to be employers that say, you know what, we would have done it differently. We don't think this was the best idea. We think you should have gone a different way. There may be unions that think the same thing. We don't think this is the best plan. We think it should have gone a different way. But Congress did not give individual entities the right to come in and second guess the trustees' decision because they understood that this was going to be sort of a difficult pie to put together. You know, it does bother me that I know, as Judge Wilson said, that this employer can withdraw and then be sued and make all of his points. But that's a fairly harsh remedy. Is there any other remedy that the employer has? I mean, this is a pretty substantial liability that is potentially imposed. Yes, Your Honor, and it is consistent with the way the statute has operated in the past. So, for instance, we haven't gotten to the withdrawal liability piece yet, but it's common for withdrawal liability numbers to be fairly large as well. And for small changes in plans methodology or assumptions when calculating withdrawal liability to make huge swings in the number of an assessment. So, you know, it could be a difference of many millions of dollars based upon the interest rate that the actuaries are using when the actuaries do their assumptions. And employers are very, very interested in challenging these but are not able to challenge those calculations until the assessment is actually issued. I'm worried about the employer not having any avenue to challenge this except withdrawing and then hoping. Can the employer, I assume the secretary could intervene, the employer could appeal to the secretary who has a lot broader rights and causes of action and explain how devastating this is and the secretary could intervene, I suppose. Is that right? I believe that is correct, that the secretary certainly has a much broader right of action. I don't want to speak without having looked at the statute, but the PBDC, the corporation also has a broader right of action in certain circumstances. So there are other entities other than employers that would potentially have. Am I correct that if the company's position is the correct interpretation of this statute under A10, then the company would have a cause of action as broad as in 502A1 or A3, would it not? Any violation of ERISA? I think that is the necessary implication of what Westrock has argued, yes. And that is, our position is that's plainly not what Congress wrote in the law. And this is a statute where it's extremely important to be tethered to the words. I see my yellow light is on and we haven't reached the second argument yet. I'll give you a few extra minutes. Since you drove all the way from Washington, D.C., I'll give you four more minutes. Well, I appreciate that, Judge Wilson. And I'm happy to continue on the 502A10 as long as the court has questions, but just. I think you should switch to your own. Okay. On 4301, you know, I think the panel has asked the right questions about, well, what section are you saying has been violated? And opposing counsel's answer that it's subtitle E generally is, I think, telling. They seem to be asserting a cause of action that just sort of rises in the penumbra of subtitle E, which is not what 4301 says. There's no question here that the pension fund is not asserting anything in subtitle E as the basis for its authority for this rule. It's operating under the rehabilitation provisions, which are in a totally different section of the statute. The withdrawal liability provisions themselves were adopted to address a particular problem and were drafted with that particular problem in need. And that was the problem of a plan's long-term unfunded vested benefit liabilities. So the definition of withdrawal liability within the statute is that it's the employer's allocated share of the unfunded vested benefit liabilities. So all those pensions that are going to come due over the next 30, 40, 50 years until all of the plan participants have reached their natural expiration, to use a phrase. So that relates to not only current vested benefits, but vested benefits that will, benefits that will vest over the next 30 years? No, only the benefits that have already vested, but including both participants that have already retired and participants that are still in active employment, but have already vested. Is that the major difference between unfunded vested benefits that the 4301 talks about and accumulated funding deficiencies? Is the major difference that the former deals with currently vested benefits and the latter deals with the projection of inability to fund the plan in the future as to benefits that will, in fact, vest in the future? The funding deficit is a totally different calculation. And it goes to, it looks at the— So what I just said is wrong and you're getting ready to tell me what the right answer is. Is that right? That's right, Your Honor. The funding standard account, it's, you can think of it more like, it's a little more to think of it as the fund's yearly balance sheet. So it looks at the fund's normal costs for the year, which include all the fund's administrative costs in addition to the benefits that were accrued during that year and certain amortization of certain other long-term expenses that the actuaries in their amortization have to attribute to that particular year. So it looks at that as being the cost for the year and then compares it to what the plan took in for the year. So if a plan is operating at a surplus, then it gets to carry over that surplus on its sort of balance sheet, its funding account, to the next year. If the plan has a year where it operates at a deficit, it has to carry that deficit over to the next year's funding standard account. So just to illustrate this, this particular plan did not have a deficit in its funding standard account until the end of 2014. Whereas it has been assessing, it has had a problem with the unfunded vested benefits for much longer and it's been assessing that for I think about a decade now. So it's, you know, these are complicated actuarial concepts, but they are very different calculations that are done by the actuaries and they are targeted at very different problems. If that assists the Court. I see no more questions. Okay. Thank you, Ms. Keller. I thank you. Just a couple points, Your Honors. They are different, but there's also double counting. If every employer withdrew today and was charged both the accumulated funding deficiency and withdrawal liability and they were all able to pay it in a lump sum, the plan would actually collect more than it needs to pay everyone's benefits. So there is a piece of the funding deficiency that does make up withdrawal liability. And again, it really doesn't matter because this is a rule that applies to withdrawn employers. Congress has already said what withdrawn employers pay. They pay withdrawal liability. So they have a rule that goes beyond what Congress allowed. It's clearly an act under Subtitle E that gives employers an express cause of action under 4301A1. And I think I said all I can about 502A10. So I'm just going to focus more on 4301A1. And I want to go back to the J.B. Viva Vegas case. I think it would be helpful to understand the facts a little bit there. What was being challenged was a plan rule that was trying to eliminate a specific exception to withdrawal liability. Some industries don't have to pay withdrawal liability under certain rules. This plan tried to take away that special exemption. The employer in that case had not withdrawn. So it wasn't about withdrawal liability. So they just wanted the rule declared null and void so they would know if they withdrew whether they would have this liability or not. And the court said it's not subject to arbitration because 4221 only triggers arbitration when there's an assessment. There wasn't here and you're challenging a broad rule. 4301A1 gives you a cause of action to do so. And we're also not second-guessing. It is. What case are you talking about? Davis, you say? Oh, it's the J.B. Viva Vegas versus Nevada Resort Association Pension Fund out of District Court of Nevada. We provided it in a 28-J letter. And just to the second-guessing about trustee's decisions. We're not second-guessing a trustee's discretion. What we're saying is you've done something that's illegal and we have a cause of action to challenge it under 42301A1. And we still think under 502A10. Wait a minute, you just said something that sort of boggles my mind. You're not challenging the trustee's discretion. You're just saying they did something illegal? There are certain things they can choose to do that isn't illegal. And I would agree that employers can't challenge it. For one, they can decide we want a 3% increase in contributions rate instead of a 4% increase or a 5% instead of a 4%. If that's what they were doing, we couldn't challenge it. Because that's their decision. They decide what schedules to present to the bargaining parties. The bargaining parties get to pick which schedule. But they can't do something that violates the law and say, well, we're just using our discretion. Discretion can't mean to violate the law. But I see I'm out of time. So unless there's any other questions. All right. I think we have the argument. Thank you, counsel.